Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE NORTHERN  DISTRICT OF TEXAS
 2                      DALLAS  DIVISION
 3   UNITED STATES OF AMERICA,      )          CRIMINAL NO.
                      Plaintiff     )          3:14-CR-307-N
 4                                  )
     VS.                            )          DALLAS, TEXAS
 5                                  )
     JADA ANTOINE (1),              )
 6                  Defendant       )          AUGUST 24, 2015
 7
 8            TRANSCRIPT OF SENTENCING PROCEEDINGS
            BEFORE THE HONORABLE DAVID C. GODBEY
 9                UNITED STATES DISTRICT JUDGE
                   VOLUME 1 OF 1 VOLUME
10
11   APPEARANCES:
12   For the Plaintiff:          UNITED STATES ATTORNEY'S OFFICE
                                 BY:  MR. DOUG BRASHER
13                               Assistant United States Attorney
                                 1100 Commerce, Third Floor
14                               Dallas, Texas  75242-1699
                                 (214)  659-8600
15
16   For the Defendant:          FEDERAL PUBLIC DEFENDER'S OFFICE
                                 BY:  MR. GABRIEL REYES
17                               Assistant Federal Public Defender
                                 525 Griffin, Suite 629
18                               Dallas, Texas  75202
                                 (214)  767-2746
19
20   Court Reporter:             Linda J. Langford, CSR, RDR, CRR
                                 Chambers of Judge David C. Godbey
21                               1100 Commerce Street, Rm. 1504
                                 Dallas, Texas  75242
22                               (214) 748-8068
23
24   Proceedings reported by mechanical stenography, transcript
25   produced by computer.
```

333f5d05-e437-487e-b696-0882dae65fd6

Page 2

```
 1                    P R O C E E D I N G S

 2                      AUGUST 24, 2015

 3            THE COURT:  Are we ready to proceed with

 4   sentencing of defendant Antoine?

 5               MR. BRASHER:  Doug Brasher for the government.

 6            THE COURT:  Good morning.

 7               MR. REYES:  Gabriel Reyes for the Federal Public

 8   Defender's Office representing Ms. Jada Antoine.

 9            THE COURT:  Good morning.

10         I've seen the presentence report, the government's

11   objections, the defendant's response to the PSR, the govern-

12   ment's response to the defendant's objections, the addendum

13   to the PSR, the government's second objections, the cor-

14   rected government second objections, the government's motion

15   for upward departure or variance, and then the defendant's

16   response and objections to the addendum, and the defendant's

17   response to the government's motion for upward departure.

18         Are there any other written materials that I should

19   have in front of me in connection with sentencing?

20               MR. REYES:  No, Your Honor.  I would just point

21   out that the response to the government's motion for an

22   upward departure also has a last paragraph that functions

23   as the defendant's request for a downward variance.

24            THE COURT:  Yes, you're absolutely correct, and

25   it's noted so in the style.  I was abbreviating.  But I'm
```

Page 3

1    aware that that is in there.

2              MR. REYES:  And I would also note that docket

3    number 56 is a second addendum to the presentence report

4    that issued on Friday morning.  I'm sorry.  We would note

5    that Docket number 56 is a second addendum to the pre-

6    sentence report that issued on Friday morning.

7              THE COURT:  That one I haven't seen yet.  If

8    you'll bear with me for just a moment, I'll take a look

9    at that.

10             MR. REYES:  Yes, Your Honor.

11        (Off the record.)

12             THE COURT:  Okay.  Thank you for bringing that

13   to my attention.

14        If I could ask you to confirm for me, Mr. Reyes, that

15   you've had an opportunity to review the presentence report

16   and the two addenda?

17             MR. REYES:  Yes, Your Honor.

18             THE COURT:  And, Ms. Antoine, have you also had a

19   chance to review those?

20             THE DEFENDANT:  Yes, Your Honor.

21             THE COURT:  I have some concerns based on the

22   arguments raised by the defendant about the loss amounts,

23   also about the nature of the offense.

24        And this maybe is more a question for the government

25   to address when it gets to be your turn, but the -- it's not

333f5d05-e437-487e-b696-0882dae65fd6

Page 4

1   clear to me, for example, that there's any evidence that

2   the defendant, though lacking the credentials, did anything

3   differently than a nurse with the credentials would have

4   done.

5        And I understand she was acting under false pretenses,

6   but I don't know that that necessarily equates every time

7   she touched a patient with an assault.  So almost from a

8   philosophical sense, I have a little bit of a concern about

9   that.  And because I know that somebody may someday read

10  the cold written transcript of that, I don't mean a little

11  bit of a concern.  I mean, it's concerning to me.

12       So I share those two thoughts with you-all to begin

13  with.  The loss amount and the nature of the offense are

14  of a concern to me because of the reasons raised by the

15  defendant.

16       Having said that, I should listen instead of talk.  So

17  I'm happy to listen to whatever the defense would care to

18  present.

19            MR. REYES:  Thank you, Your Honor.

20       This matter has been extensively briefed on both sides,

21  by both the government and the defense, and I'm going to be

22  brief and probably not going into as extensive an argument

23  as I normally would.

24       I would just note that in my request for a downward

25  variance, I did not make mention of the new guidelines that

333f5d05-e437-487e-b696-0882dae65fd6

Page 5

 1   are going to take effect, will likely take effect later this

 2   fall.  I heard the Court recognize those new guidelines and

 3   follow them in an earlier sentencing here.

 4        So I would note that the new guidelines would require a

 5   showing of substantial financial hardship for that six-point

 6   enhancement that the government is advocating for in terms

 7   of a victim enhancement, and they would also make the victim

 8   enhancement mutually exclusive with the vulnerable victim

 9   enhancement which the government is also advocating for.  So

10   I would like to point those two things out for the Court.

11        It's my position, of course, that the victim enhance-

12   ment does not apply.  There is no showing, as the Court has

13   just noted, of any serious bodily injury and certainly not

14   as that term is defined under the guidelines.

15        There is also no showing in the PSR that the hospice

16   patients were financial victims or suffered any loss.

17        The intended loss amount, Your Honor, I think just

18   gets down to where the guidelines and common sense seem to

19   take two different paths and seem to diverge.

20        What my client did was, admittedly, she stole an

21   identity.  She worked as a nurse, making the potential of a

22   nurse when she wasn't, and what she got in return for that

23   and what that cost the hospice was -- or the hospices in

24   this case was about $100,000 in salary that it could have

25   paid to a registered nurse, someone who was licensed and

333f5d05-e437-487e-b696-0882dae65fd6

Page 6

1    had the qualifications as certified by the State to do

2    what she did.

3              THE COURT:  So do we have a number for the

4    defendant's services that were billed to the government?

5              MR. REYES:  We don't have a -- and that's why

6    these loss numbers are not reliable, Your Honor.  We don't

7    have a specific number of what she did and how that was

8    billed to the government.

9         The way hospice is billed in -- in memorandums of

10   interviews with some managers at the hospices, some say it's

11   billed per patient per day.  So there's a quote established.

12   In some records that the government provided us, it shows

13   that hospices bill on a monthly cycle.  So, you know, there

14   may be a team of eight people who attend to a patient and

15   the hospice bills out to Medicare/Medicaid at the end of

16   the month certifying that the patient was seen and that

17   they should get 4- or $5,000 for that service.

18        What did she did and what she contributed to that bill

19   is unclear to us as the defense, I think it's unclear to

20   the government, and it's unclear to the hospices themselves.

21   They just don't track it that way.

22             THE COURT:  What do you think would be a reason-

23   able estimate of that number?

24             MR. REYES:  I think in these situations, we look

25   at what she gained.  I believe the PSR -- original PSR,

333f5d05-e437-487e-b696-0882dae65fd6

Page 7

1    docket 34-1, had a figure of about $107,000 as salary that

2    was paid to her during this time.

3              THE COURT:  You're answering a question that's

4    different from the one that I asked.  And it may be you

5    just don't know, and that's fine.  What do you think is a

6    reasonable estimate of the amount billed to the government

7    for her services?

8              MR. REYES:  I don't know.  I don't think anyone

9    knows.

10             THE COURT:  Okay.

11             MR. REYES:  What we know is what it cost the

12   hospice to employ her, and perhaps we can assume that it

13   would be reasonable to mark up an employee's services by

14   10 percent, 20 percent, maybe 100 percent.  But certainly

15   you don't pay someone $100,000 over two years and then claim

16   that the loss is 2 and a half million or 800,000.  That's a

17   lot of leverage, Your Honor.

18             THE COURT:  Okay.

19             MR. REYES:  At this point, Your Honor, I'd rest on

20   the arguments I've made and the pleadings.  And I would just

21   respond to the government's argument in turn after they have

22   made their presentation.

23             THE COURT:  Okay.  What says the government?

24             MR. BRASHER:  Your Honor, to address the loss

25   issue, I'll start there.  The government -- the Court only

333f5d05-e437-487e-b696-0882dae65fd6

Linda J. Langford, CSR, RDR, CRR

Page 8

1   needs to come up with a reasonable estimate of the loss.

2   That's not to diminish the difficulty that is before the

3   Court in determining an exact number.  But the number that

4   we have come up with I think is more than reasonable.  In

5   fact, it's very conservative and in favor of the defendant.

6        Medicare is billed for hospice on a monthly basis, a

7   30-day period at a time.  And just to be clear, hospice

8   patients, to be qualified for hospice, there needs to be a

9   medical certification that the patient has six months or

10  less to live.  There are some patients who outlive that six

11  months, but we're really talking here about end-of-life care

12  for dying, chronically ill, chronic pain patients who are

13  facing near death.

14       The issue with the correction of the billed amount

15  which is the best -- the best representation what the

16  intended loss is the amount that was billed for these

17  one-month periods where the defendant saw one of the

18  patients.

19       Now, the Medicaid folks, when they figured their loss,

20  they were working off of one set of data, and the Medicare

21  folks were working off a different set of number -- different

22  set of data.  And we fixed that, and that's why the number

23  was reduced downward to the 800,000 figure where we are now.

24       Now, there's a difference between the intended loss,

25  which I think is the best way to look at that is the amount

333f5d05-e437-487e-b696-0882dae65fd6

Page 9

1  that was billed, that was the amount that the hospice

2  intended -- the hospice agencies intended to get as a

3  result of this fraudulent conduct, which is different

4  from the actual loss.

5       THE COURT:  The concern that I have is it appeared

6  to me that the calculation the government made, for example,

7  if the defendant touched a patient once during the month,

8  you counted the whole month as intended loss.  And that just

9  seems excessive to me.

10       MR. BRASHER:  And that's -- if I understand what

11  Your Honor is saying, is that I think that's a valid way to

12  capture the intended loss.  If the Court determines that the

13  intended loss is not the right number, then you look at the

14  actual loss.  And the actual loss, the $244,000 figure that

15  has been come up with, that's looking at all those instances

16  where -- where there was one touching in one month.

17       We've thrown those out, and we've only gone with the

18  numbers where the defendant was involved in admitting a

19  patient into hospice in which case, you know, she was

20  responsible for everything that was billed under that

21  patient.

22       And if you look at the definition of actual loss, it

23  includes the reasonably foreseeable pecuniary harm.  And

24  here, I think seeing a patient once during a month, you're

25  reasonably foreseeable that that month's bill would be then

333f5d05-e437-487e-b696-0882dae65fd6

Page 10

1  submitted to Medicare and Medicaid.

2       And I think -- so when you look at the definition of

3  pecuniary loss and reasonably foreseeable when you're look-

4  ing at actual loss, it is appropriate to take the whole

5  month into consideration.  But we haven't even done that.

6  We've thrown out months where -- where that hasn't been

7  done.

8            THE COURT:  Okay.

9            MR. BRASHER:  And if I could just then contrast

10 that with the salary that the defendant earned.  That's

11 really the gain.  And the guidelines say that you shouldn't

12 use the gain if you can come up with an actual or intended

13 loss.  So I don't think in any instance it would be

14 appropriate -- and again we don't need to come up with an

15 exact figure under the intended loss or actual loss, but a

16 reasonable estimate.  And I think the PSR and the addenda

17 have done so.

18            THE COURT:  If she admitted a person to hospice

19 and an RN or a doctor would have done the same thing, is

20 that actual loss because she did it when someone else would

21 have done the same thing?

22            MR. BRASHER:  Yes.  Medicare or Medicaid take

23 the position that they don't pay for claims when they are

24 produced through fraudulent means.

25       So had Medicare and Medicaid known the true facts, they

Linda J. Langford, CSR, RDR, CRR

1  would not have paid for the services of these patients, both

2  the monthly visits or everything after the admission date in

3  the instances where she was working as an admissions nurse.

4          THE COURT:  And I can understand that if a person

5  were fraudulently admitted and received services that they

6  didn't need or weren't merited.  But that's not the argument

7  you're making.  You're saying because this woman didn't have

8  credentials, we're going to assume anybody she admitted, we

9  shouldn't have paid for and wouldn't have paid for.

10         MR. BRASHER:  That's correct.

11         THE COURT:  Okay.

12         MR. BRASHER:  And if I could address the number

13 of victims issue.  Currently -- and I would agree if the

14 new guidelines were to be looked at, currently there is

15 zero enhancements applied for the number of victims.  Under

16 the new guidelines, it would at least be plus two for the

17 hardship that was faced by the individual whose identity

18 was stolen.  And she is here today and would like to

19 address the Court when the Court would like to hear that.

20         THE COURT:  Okay.

21         MR. BRASHER:  But under the current guidelines, I

22 think -- and -- and even under of the new guidelines, there

23 is a potential for the additional six-point enhancement.

24     The reason for that is, while the text -- now it says

25 substantial financial hardship, when you look at what a

333f5d05-e437-487e-b696-0882dae65fd6

Page 12

1   victim is, the definition of a victim, under comment 1,

2   it's someone who sustained actual loss or sustained bodily

3   injury.  We're not arguing under that point.

4         But if you look at comment 4(e), it addresses

5   specifically those cases that involve means of identifi-

6   cation.  This is a case involving fraud, fraud involving

7   means of identification.  And under that provision, under

8   that commentary, any individual whose means of identifica-

9   tion was used unlawfully or without authority is considered

10  a victim.

11        And in this case the bills could not get submitted to

12  Medicare and Medicaid unless the defendant was using their

13  means of identification.

14        Now, the PSR comes out, after the probation officer

15  discussed this issue with the folks in D.C., decided that

16  the defendant's use of the means of identification, in this

17  case the patients', fell outside the definition of relevant

18  conduct for which she would be accountable for.  I think

19  that just overlooks the reality of how billing is done in

20  the medical field.

21        The defendant did not enter the billing.  She did not

22  personally bill claims to Medicare, but instead billing

23  personnel at the hospice agencies did that for her.  And

24  if you look at the definition of relevant conduct, that

25  includes all acts and omissions the defendant -- a whole

333f5d05-e437-487e-b696-0882dae65fd6

Page 13

1  list of things, but ultimately willfully caused.  And she

2  definitely willfully caused the billing agency -- the

3  billing personnel at these agencies to submit claims to

4  Medicare.

5      So I think under that definition, these patients should

6  be considered victims.  And I think if you take an even

7  bigger step, broader view, the common sense view, anyone

8  would look at this case and consider these patients to be

9  victims of the defendant.

10     And, lastly, the vulnerable victim issue, the defini-

11  tion of victim under the vulnerable victim enhancement is

12  different and even broader than it is for the multiple

13  victim enhancement.  And, again, here I think the evidence

14  is clear that these -- the patients had their privacy

15  violated, they were both -- their medical information and

16  their bodies were revealed to the defendant.  They were

17  deprived of legitimate medical care, and they are certainly,

18  as I mentioned, because they are hospice patients, you know,

19  perhaps the definition of vulnerable victims.

20     So I think for these reasons, that's why we're asking

21  for an upward departure in this case.  It was a particularly

22  egregious case where the defendant preyed on individuals

23  who were less likely to report her, to recognize her as an

24  imposter and to get away with it.  And that aspect of it is

25  not reflected in the -- in the PSR.

333f5d05-e437-487e-b696-0882dae65fd6

1             THE COURT:  All right.  And defendant's response?

2             MR. REYES:  Your Honor, the Court can't lose focus

3     that what happened here, the real offense conduct and what

4     the guidelines tend to or the goal of the guidelines is to

5     punish the real conduct.  What happened was she stole one

6     person's identity and she used that identity fraudulently.

7         But in terms of providing services, she did provide

8     the services that she sought employment for.  And I haven't

9     heard that anyone suffered any more harm than they would

10    have suffered if they had been attended to by a registered

11    nurse.  I think the Court has zeroed in on that argument.

12        Also, we've got to look at the nature of -- of hospice

13    care.  You have got into hospice once it's been determined

14    that there aren't medical alternatives for your situation.

15    It's about dying with dignity.  It's about companionship.

16    It's about spiritual healing in your final days.  And mem-

17    bers who form part of the hospice team are often spouses

18    or they're lay people.  It's a community of people who are

19    there to assist the patient in these dying days.

20        It's not about providing medical care the way you might

21    expect in the NICU after you give birth to an individual.

22        I think document 4, attachment 4 to document 54, really

23    shows what's going on in the hospice situation.  Okay.

24        My client, yes, she might have participated in admit-

25    ting someone, but even when she admits someone, if we look

1    at that form, and it's attachment 2 to document 54, there's

2    an attending physician signature at the bottom of that form.

3         If you look at attachment 4 to document 54, there are

4    two physicians listed, associated physicians with the

5    patient.  And then there are associated personnel.  There

6    are about seven individuals with varying credentials who

7    are associated with that patient.  So to say that Ms.

8    Antoine is there denying someone legitimate medical

9    services is a bit of an overstatement.

10        She's there participating as part of a team, and as a

11   human being, she is operating to the best of her abilities.

12   She's not credentialed, but she's using common sense judg-

13   ment to attend to people who the medical community have

14   said, we can't do much more for them.

15        I would also note that Exhibit 3 to document 54 is

16   actually a status update written by a patient's wife.  So

17   here the patient's wife, as part of a medical team, is

18   saying, this is what I observed, this is what needs to be

19   done, this is what I did.  And this is no different than

20   what Ms. Antoine was doing in that situation.

21        In terms of vulnerable victims, I can see the

22   government's viewpoint to a certain extent.  But these are

23   individuals who are there to be comforted.  And I believe

24   she did comfort them and who needed routine medical care in

25   the words of one of the individuals who was interviewed by

Page 16

1    the investigators.  And I think she did provide that to

2    them, and she didn't cause them any more harm than they

3    faced by the nature of their own situation.

4            THE COURT:  All right.  Did I understand that

5    you had a victim who was here who wanted to address me?

6            MR. BRASHER:  Yes.  Yes, Your Honor.  And just

7    for the Court, she is still very sensitive to her name.

8    As far as I know, any time her name has been used, then

9    the document has been filed under seal.  And she's asked if

10   we could refer to her by her initials today here in court.

11           THE COURT:  Yes.

12           MR. REYES:  No objection from the defense,

13   Your Honor.

14           MR. BRASHER:  Your Honor, this is UMS.

15           MS. UMS:  Hi, Your Honor.

16           THE COURT:  Good morning.

17           MS. UMS:  April 23rd came -- was the day that I

18   became aware that my identity had been stolen.  I reported

19   this to every government agency that I thought would have

20   interest in my plight.  I replayed the day that I found

21   out that the IRS was looking -- had been looking for me

22   for about a year and a half due to monies that I had not

23   reported that had been earned in my name.  That day I felt

24   like I wanted to, you know, end everything.

25           But through it all, my greatest concern has been for

333f5d05-e437-487e-b696-0882dae65fd6

Page 17

1    the families impacted by the deception of the misuse of my

2    identity.

3         My heart continues to ache every time that I think of

4    all of the lives of people who have little to no power at

5    such a vulnerable time in their lives.  There was a targeted

6    population of patients, as you have discussed already, in

7    hospice.  And many of them were at the mercy of this person

8    who was trying to deliver quality and/or end of life care.

9         And based on what you said earlier about the concern

10   about whether or not they had received the adequate care

11   that they may have been needing, there could have been a

12   lack of care because the person who used my identity did

13   not have the skills nor the knowledge or the appropriate

14   licensure as a registered nurse.

15        It's hard to imagine what those people had to endure

16   because of this lack of skill and knowledge.  I worked

17   really hard to study for and obtain my degree to test for

18   the licensure as well as to maintain my nursing licensure.

19        There has been a financial impact to me as well.  I

20   receive daily calls from creditors because my credit has

21   been ruined.  My mail was tampered with.  A car was

22   purchased in my name.  An apartment was leased as well as

23   Payday Loans that were taken.  And that's just to name a

24   few things that happened.

25        I have been with the same employer for the past five

333f5d05-e437-487e-b696-0882dae65fd6

Page 18

1   years.  And, quite frankly, I'm afraid to apply for jobs

2   because of fear of rejection because nowadays most places

3   want to check your credit before they will employ you.

4        Not only has there been a financial impact but there

5   has also been a social impact as well.  It's really diffi-

6   cult for me to trust people because in my mind there is an

7   ulterior motive that also exists.

8        Every patient deserves access to care to a nurse who

9   has the knowledge, the skills, and most importantly the

10  appropriate licensure in the state in which they practice.

11       I ask that you consider not only the blatant misrepre-

12  sentation of my identity but also consider every patient

13  and family member who was impacted by this deception.

14       And that's all I have, Your Honor.

15            THE COURT:  Thank you, ma'am.

16       Anything else from the defense?

17            MR. REYES:  Yes, Your Honor.  My client knows she

18  did wrong.  She admits that.  That's why she pled guilty.

19  This isn't about denying her responsibility in any way,

20  shape, or form.  Our position is that the guidelines just

21  don't fit in this case.

22       They don't fit for several reasons.  One, when we think

23  of fraud, we think of, you know, people perhaps billing to

24  Medicare/Medicaid for things that weren't provided.  In this

25  case, there was a service that was provided.

333f5d05-e437-487e-b696-0882dae65fd6

Page 19

1          Also, the guidelines don't work when the information

2     that's plugged into them isn't reliable and isn't reason-

3     able.  And that's what's happening here.  We just don't

4     have reliable numbers to plug into the formula.  Therefore,

5     what the formula is spitting out just isn't appropriate.

6          In terms of -- of what she did, I think she was think-

7     ing about herself and she wasn't really thinking about how

8     this could impact her relationship with her girl friend at

9     the time.  She wasn't really thinking about the -- the

10    patients and -- and their expectations and the families of

11    those people.  And she's lucky.  She's lucky that things

12    didn't turn out worse than they did.

13         But she stands before this Court with a spirit of

14    contrition.  She wants to accept responsibility for what

15    she has done, and she wants to address this Court.  And

16    she wants this Court to understand that she understands

17    those things and she's ready to live a different life.

18    And she is begging this Court for a short sentence so

19    that she can get on with a productive life.

20              THE DEFENDANT:  Your Honor, it's no excuse for my

21    actions.  I do apologize to the Court, Ursela Sparks, and

22    the victims and their families.  The way that I went about

23    this was I manipulated, I deceived, lied, to a lot of people

24    that really cared about me.

25         And I just ask for forgiveness from Ursela Sparks for

333f5d05-e437-487e-b696-0882dae65fd6

Linda J. Langford, CSR, RDR, CRR

Page 20

1    the way that I betrayed her trust.

2         And I've been incarcerated for a little bit over a

3    year now.  I've come to realize to be more transparent,

4    to respect other people's things as I would want them to

5    respect mine.

6         I am very deeply, deeply sorry for my actions and the

7    way that I handled the situation.  I could have handled it

8    better.  I just want, you know, her to forgive me, and the

9    Court, for being such a foolish person for doing the things

10   that I've done to everyone.  And I just ask for leniency.

11             THE COURT:  Anything else from the defense?

12             MR. REYES:  Your Honor, there are a lot of

13   guidelines calculations before the Court.  We think that

14   an appropriate guideline recommendation would be 18 to 24

15   months, and we'd accept a sentence at the high end of that

16   recommendation at two years, Your Honor.

17             THE COURT:  All right.  I'm going to state my

18   proposed sentence and give counsel an opportunity to

19   add any further objection or comment or request for

20   recommendation before formally imposing sentence.

21        I'm adopting the factual contents of the presentence

22   report as my factual determination in connection with

23   sentencing except as I am about to note:  I think the

24   appropriate number for intended or actual loss is not

25   accurately calculated here.  I don't have any problem with

333f5d05-e437-487e-b696-0882dae65fd6

Page 21

1   the idea that billings to the government for services that

2   the defendant provided are loss.

3       I do think there could be an argument made that the

4   government should show only billings that were submitted

5   that would not otherwise have been submitted are loss.  In

6   other words, if a properly credentialed person had been

7   there in the defendant's place, they would not have pro-

8   vided certain services.  I could see that argument, what

9   was billed here that would not otherwise have been billed.

10      But I think probably the better determination is

11  that whatever was billed for this defendant's time was

12  improperly billed.

13      I disagree with the government that if she admitted

14  a patient, that all of the billings for that patient

15  thereafter were tainted.  That -- that doesn't seem to me

16  to be a correct number.

17      So it appears to me that, from the information in

18  front of me, the numbers are not calculated correctly, and

19  I don't necessarily have the appropriate information to

20  determine how much was billed to the government for this

21  defendant's services.  So I'm forced to make an estimate

22  of that.

23      The income that she received was approximately

24  $107,000.  I agree with the defense that it's appropriate

25  to double that as the amount of actual loss because I don't

333f5d05-e437-487e-b696-0882dae65fd6

Linda J. Langford, CSR, RDR, CRR

Page 22

1    think she was billed dollar for dollar to the government

2    for what she was paid.  I think there's a profit margin in

3    there for the provider.

4         So I think a reasonable estimate of the actual loss

5    here is $214,000, which results, I believe, in a six-level

6    reduction of the guideline calculations.

7              MR. REYES:  Your Honor, out of candor with the

8    Court --

9              THE COURT:  Yeah.  Help me out.

10             MR. REYES:  Yes.  -- there was some other loss

11   here unrelated to the Medicare/Medicaid.  I think there was

12   a vehicle purchased, and I think Probation noted that out

13   in their second addenda that they had a concrete figure,

14   which we wouldn't object to.  So 29,000 --

15             THE COURT:  Yeah.  I don't think that's going

16   to affect the guidelines.  So if we add that in, we're at

17   233-?

18             MR. REYES:  Yes, Your Honor.

19             THE COURT:  And I appreciate your help with that

20   arithmetic.

21             MR. BRASHER:  Your Honor, if I could ask for

22   clarification.  When you say a six-point reduction, what

23   number are you working from?

24             THE COURT:  I'm sorry.  I'm looking at --

25             MR. BRASHER:  Or maybe it would be easier to say

Linda J. Langford, CSR, RDR, CRR

Page 23

1    what the increase would be under 2B1.1(2) -- b(2) -- b(1).

2           THE COURT:  I think the 2B1.1 special offense

3    characteristics is 12.

4           MR. BRASHER:  So working off the addenda, that

5    would be a two-point decrease off the second addenda.

6           THE COURT:  You're correct.  I think I was

7    looking at the first addenda when I said a six point.

8    Yes, two-point reduction from the second addendum.

9        I'm going to sustain the objection to risk of serious

10   bodily injury or death because I haven't heard anything

11   that supports that.

12       On the other hand, I'm going to grant the government's

13   variance request due to the vulnerable nature of the

14   patients.  And I think the reason that was not included is

15   because they were not considered victims.  But in a real

16   world sense, I believe they were.  So those two net out.

17       And I believe where that puts us all in all is offense

18   level 21, criminal history category III, for a sentencing

19   range of 46 to 57 months.

20       Is that consistent with counsels' arithmetic?

21          MR. REYES:  Yes, Your Honor.  I'm getting an

22   offense level 21 as well.

23          THE COURT:  Yes?

24          PROBATION OFFICER:  Your Honor, I'm sorry.  You

25   said the 2010 guideline manual or are you using the 2015

U.S. District Court

333f5d05-e437-487e-b696-0882dae65fd6

Linda J. Langford, CSR, RDR, CRR

Page 24

1   manual for the loss in question?

2           THE COURT:  I'm using 2014.

3           PROBATION OFFICER:  So that would be the same as

4   2010.

5           THE COURT:  I believe you.  This is just the one

6   that I had at hand.

7           MR. BRASHER:  If I could -- the reason we were

8   using the 2010 is because, with the initial loss calcula-

9   tion, we were over a million and that made a difference.

10  But now that we're under a million, it doesn't make a

11  difference.  So my understanding is the purple book should

12  work.

13          PROBATION OFFICER:  If you're using the amend-

14  ments, that does make a difference in the loss amount.

15          THE COURT:  Okay.  Tell me what it is under the

16  amendments.

17          PROBATION OFFICER:  When the 2015 guideline manual

18  comes into effect, you would have a minimum of 150,000 loss.

19  So it would be an increase of 10 levels instead of 12.

20          THE COURT:  Okay.  So we're down to 19?

21          MR. BRASHER:  Your Honor, if we use the new

22  guidelines, then I believe there should be two points for

23  the victim who suffered financial -- substantial financial

24  hardship as she mentioned today.

25          MR. REYES:  I believe there were already two

333f5d05-e437-487e-b696-0882dae65fd6

Page 25

1   points added under the 2010 guidelines at paragraph 37,

2   document 56-1.

3           PROBATION OFFICER:  Use of means of identification

4   but not necessarily the victim impact.

5           MR. REYES:  That just appears cumulative, Your

6   Honor.

7           THE COURT:  All right.  Let me say this.  I think

8   that sentencing range is appropriate, given the overall

9   conduct that's at issue.  And if the guideline calculation

10  actually should be higher or lower, I would depart from the

11  guidelines and sentence within the 46- to 57-month range.

12  That seems to me, given all of the various issues that are

13  involved here, to be an appropriate range.

14      It therefore is my intention to sentence the defendant

15  to 48 months in the custody of the Bureau of Prisons.

16      It is not my intention to impose any fine due to

17  inability to pay.

18      I will require restitution in the amount of $233,000,

19  payable first to the individual victim to the extent her

20  losses were part of that number, and otherwise payable to

21  the government.

22      If upon commencement of the term of supervised release

23  any part of the restitution amount remains unpaid, it's my

24  intention to require the defendant to make payments on the

25  balance in monthly installments of not less than 10 percent

Linda J. Langford, CSR, RDR, CRR

Page 26

1    of the defendant's gross monthly income or $50 per month,

2    whichever is greater, beginning 60 days after release.

3         In addition, at least 50 percent of the receipts

4    received from gifts, tax returns, inheritances, bonuses,

5    lawsuit awards, and any other receipt of money shall be

6    paid toward the unpaid balance within 15 days of receipt.

7         It is also my intention to place the defendant on

8    supervised release for a term of three years subject to the

9    standard conditions provided by the Sentencing Commission

10   as well as the following additional conditions:

11        1.  The defendant shall not commit another federal,

12   state or local crime.

13        2.  The defendant shall not illegally possess a

14   controlled substance.

15        3.  The defendant shall cooperate in the collection

16   of DNA.

17        4.  The defendant shall not possess a firearm.

18        5.  The defendant shall report in person to the

19   probation office in the district to which the defendant

20   is released within 72 hours of release.

21        6.  The mandatory drug testing condition is suspended

22   based on the Court's determination that the defendant poses

23   a low risk of future substance abuse.

24        7.  The defendant shall refrain from incurring new

25   credit charges or opening additional lines of credit with-

333f5d05-e437-487e-b696-0882dae65fd6

Page 27

1   out approval of the probation officer.

2        8.   The defendant shall provide to the probation

3   officer any requested financial information.

4        9.   The defendant shall not transfer, sell, give away,

5   or otherwise convey any asset with a value of $500 or more

6   without approval of the probation officer.

7        10.  The defendant shall pay restitution as previously

8   indicated.

9        11.  The defendant shall not be employed by, affiliated

10  with, own or control or otherwise participate, directly or

11  indirectly, in any business which involves access to credit

12  information of other persons, including but not limited to,

13  handling of credit cards, bank checks, drafts, or other

14  financial documents, without the probation officer's prior

15  approval.

16       12.  The defendant shall not possess any form of

17  identification in any name other than her own true and legal

18  name, showing a date of birth of March 24, 1981.  She shall

19  not possess, handle, or distribute any identification,

20  credit cards, bank checks, or other financial instruments

21  in any name other than her true name.

22       13.  The defendant shall not possess any mail items

23  in any name other than her true and legal name unless the

24  items were mailed to a physical address, post office box,

25  or other mailing address on file with the probation officer

333f5d05-e437-487e-b696-0882dae65fd6

Page 28

1   prior to the date posted on the mailed item.

2        She shall not possess, handle, or distribute any

3   identification, credit cards, bank checks, or other

4   financial instruments in any name other than her true

5   name.

6        14.  The defendant shall notify the probation officer

7   within 72 hours of acquiring or changing a post office box

8   or address at which she may receive mail, parcels, or

9   courier delivery, whether personal or business related.

10       And I can't remember if I said this or not.  I apolo-

11  gize if I'm repeating.  I will impose the mandatory special

12  assessment in the amount of $100.

13       Having stated the Court's proposed sentence, is

14  there any further objection or comment or request for

15  recommendation?

16            MR. REYES:  Your Honor, we'd just request a

17  designation of somewhere near Houston.

18            THE COURT:  I will make that recommendation.  As

19  I'm sure you have told Ms. Antoine, my recommendation is

20  not binding on the Bureau of Prisons.  They make their

21  own determination, but I do think they give it some

22  consideration.  So, yes, I will make that recommendation.

23            MR. REYES:  Thank you, Your Honor.

24            THE COURT:  Then sentence is imposed as previously

25  indicated.

333f5d05-e437-487e-b696-0882dae65fd6

Page 29

1          I'm required to advise the defendant regarding her

2     rights to appeal.

3          I believe you have waived those appellate rights as

4     part of the plea agreement.  If so, such waiver is usually

5     enforceable.  However, if you believe the waiver is not

6     enforceable in your particular circumstances, you can

7     present that argument to the Court of Appeals.

8          You have the right to request to appeal at no cost if

9     you do not have enough money for the appeal, and you may

10    request the clerk of court to prepare and file a notice

11    of appeal on your behalf.  With very few exceptions, any

12    notice of appeal must be filed within ten days of entry of

13    formal entry judgment.

14         Having advised Ms. Antoine regarding her rights to

15    appeal, is there anything else we need to take up this

16    morning with regard to this defendant?

17              MR. REYES:  Not from the defense, Your Honor.

18              MR. BRASHER:  The government moves to dismiss

19    Count Two of the indictment.

20              THE COURT:  Count Two is dismissed as to this

21    defendant.

22         Then the defendant is remanded into custody, and

23    counsel may be excused if you have nothing further with

24    us.

25              MR. BRASHER:  Thank you, Your Honor.

333f5d05-e437-487e-b696-0882dae65fd6

Linda J. Langford, CSR, RDR, CRR

Page 30

1           THE COURT:  And I think we'll take about a

2    10-minute break and resume at 11:15.

3         (The proceedings were concluded.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

U.S. District Court

333f5d05-e437-487e-b696-0882dae65fd6

Linda J. Langford, CSR, RDR, CRR

Page 31

1                    I N D E X

2                                          PAGE

3    REMARKS OF COUNSEL:

4

5       MR. REYES ......................................   4

6       MR. BRASHER ....................................   7

7       MR. REYES ......................................  14

8

9    VICTIM IMPACT STATEMENT ..............................  16

10

11   REMARKS OF COUNSEL - MR. REYES .......................  18

12

13   ALLOCUTION OF DEFENDANT ..............................  19

14

15   REMARKS OF COUNSEL - MR. REYES .......................  20

16

17   SENTENCING ...........................................  20

18

19   RIGHTS TO APPEAL .....................................  29

20

21   GOVERNMENT MOTION TO DISMISS..........................  29

22

23   REPORTER'S CERTIFICATION..............................  32

24

25

333f5d05-e437-487e-b696-0882dae65fd6

Linda J. Langford, CSR, RDR, CRR

Page 32

1

2                              CERTIFICATION

3

4        I certify that the foregoing is a true and correct

5   transcript from the record of proceedings in the above-

6   entitled matter.  I further certify that the transcript

7   fees format comply with those prescribed by the Court

8   and the Judicial Conference of the United States.

9

10       s/Linda J. Langford     Date:  November 27, 2015

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

333f5d05-e437-487e-b696-0882dae65fd6